# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

TERESA F. BAUMAN,  )
)
    Plaintiff,  )
)
v.  ) Case No. 4:13-CV-2569-RLW
)
CAROLYN COLVIN,  )
ACTING COMMISSIONER OF SOCIAL  )
SECURITY,  )
)
    Defendant.  )
)

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Teresa F. Bauman's ("Bauman") application for disability insurance benefits under Title II and Title XVI of the Social Security Act.

## I. Background

The Social Security Administration ("SSA") denied Bauman's application for benefits (Tr. 111-22) and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Bauman's request and a hearing was held on April 3, 2012. The ALJ issued a written decision on July 20, 2012, upholding the denial of benefits. (Tr. 17-28.) On September 18, 2012, Bauman filed a timely Request for Review of Hearing Decision with the (Tr. 7-13). In a letter dated January 15, 2014, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-6).[1] The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Bauman filed this appeal on

---

[1] Although this is the date on the letter, it may be in error given the dates of other relevant events.

December 23, 2013. (ECF No. 1). Bauman filed a Brief in Support of her Complaint. (ECF No. 17). The Commissioner filed a Brief in Support of the Answer. (ECF No. 23). Bauman has not filed a reply brief but the time for filing such a brief has run. (ECF No. 5).

## II. Decision of the ALJ

The ALJ found that Bauman had severe impairments that included depression, anxiety, fibromyalgia, Hepatitis C, and degenerative disc disease. (Tr. 19). However, the ALJ discerned that Bauman did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. Part 404, subpart P, appendix 1. (Tr. 19-21).

The ALJ determined that Bauman had the residual functional capacity (RFC) to perform a range of sedentary work as defined in 20 C.F.R. §§404.1567(a), 416.967(a), with only occasional climbing ramps and stairs, never climbing ropes, ladders, or scaffolds, and only occasionally balancing, kneeling, stooping, crouching, and crawling; she was also limited to semi-skilled work. (Tr. 21). The ALJ found that Bauman could perform her past relevant work as a telemarketer or other work existing in significant numbers in the national economy. (Tr. 26-26). Consequently, the ALJ found that Bauman was not disabled. (Tr. 28).

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Bauman's Testimony

Bauman testified on April 3, 2012 as follows:

Bauman was 42 years old at the time of the hearing. (Tr. 39). She was not receiving any workers' compensation benefits or unemployment benefits. (Tr. 40). She has a driver's license and is able to drive on occasion. (Tr. 40). She has never been told that she should not be

2

driving. (Tr. 40). She graduated from high school and had one semester of college at Jefferson County Community College. (Tr. 40). She did a nine-month program at St. Louis College of Health Careers. (Tr. 41). She also got her real estate license in 2005. (Tr. 41). She let her real estate license expire because it was too expensive. (Tr. 41). She last worked as a leasing agent for Covington Place Apartments in July/August 2008. (Tr. 41). She worked there for two months and lifted nothing over 20 pounds in that position. (Tr. 42). She left that employment because it was too demanding, given her neck fusion in 2005. (Tr. 42-43). She worked for Xentel as a telemarketer. (Tr. 43). She left that employment because she got headaches from looking at the screen. (Tr. 43). She was also an independent contractor for Apartment Search, where she would lease and show apartments. (Tr. 43-44). She worked part-time as a real estate agent beginning in 2006 or 2007. (Tr. 44). She sold about four or five houses. (Tr. 44). She worked at Penny's as a customer service representative and cashier. (Tr. 44). She left the job at Penny's for the job at Apartment Search. (Tr. 44). At Penny's she lifted at most 40-50 pounds. (Tr. 45). She was also a cashier at Home Depot for a little over a year. (Tr. 45). The most she lifted at Home Depot is about 60 pounds. (Tr. 45). She can't work now because of her leg, back and hands; she drops stuff all the time. (Tr. 45).

Bauman was in a car accident in 2005. (Tr. 46). On October 9, 2008, she was in another car accident where she broke her acetabulum. (Tr. 46). She has trouble standing and walking. (Tr. 46). She can stand for 15 minutes. (Tr. 46). She can walk maybe a quarter of a city block. (Tr. 46). She has trouble sitting for longer than 20 minutes without it starting to burn. (Tr. 47). She has used a cane, based upon Dr. Jackman's recommendation, since about six months after she got out of the hospital for her 2008 car accident. (Tr. 47). She has a lot of muscle atrophy and her knee is really weak and can give out on her at any time. (Tr. 47). She can climb a flight

of stairs one at a time. (Tr. 47). She has some trouble reaching, she can't look up because of the fusions in her neck. (Tr. 48).

She sees Dr. Wilcox and Dr. Jackman. (Tr. 48). She sees Dr. Padda[2] for interventional pain management. (Tr. 48). Bauman provided the ALJ with a list of her current medications. (Tr. 48-49). The side effects to those medications are that she gets dizzy, drowsy, and sleepy. (Tr. 49).

On a typical day, Bauman gets up in the morning, takes her medicine, gets something to eat, and she tries to help around the house. (Tr. 49). She lives in the house alone with her mother. (Tr. 49). She has a dog; she is able to let him out to go to the bathroom. (Tr. 49). She has no problem getting him food and water. (Tr. 50). She can wipe off the counter, make the bed, clean the toilet, clean the bathrooms. (Tr. 50). She goes to the grocery store with a motorized scooter. (Tr. 50, 58). She has trouble with her memory. She forgets things. (Tr. 50). She has trouble comprehending what she reads. (Tr. 51). She has low self-esteem. She has been diagnosed with depression and anxiety by Dr. Golding. (Tr. 51). She has never seen a psychiatrist or a psychologist. (Tr. 51). She has an appointment with Dr. Singh on April 13. (Tr. 51).

Her anxiety and depression causes her to have panic attacks a couple times a week. (Tr. 52). She has hobbies like listening to music, reading books. (Tr. 52). It takes her a long time to read a book but she reads a meditation on a daily basis. (Tr. 52). It took her four months to read the book and the last book she read was six months ago. (Tr. 52). It takes her 15 minutes a day to read her meditation. (Tr. 53).

---

[2] This is probably a reference to her physician(s) at the Center for Interventional Pain Management.

4

She has been clean for about a year. (Tr. 53). She relapsed for one day and had been clean for a year prior to that. (Tr. 53). Dr. Wilcox prescribes her medications. (Tr. 54). She takes medications about four times a day. (Tr. 54). She is tested for drugs on a regular basis. (Tr. 54). She has taken methadone once a day for the last two years to treat her prior substance abuse and for the pain. (Tr. 54-55). It is prescribed by Dr. Simon. (Tr. 55). She hasn't seen a psychologist or a psychiatrist until now because the medications from Dr. Simon were working and Dr. Golding wasn't doing much more than refilling medications. (Tr. 56). She is being referred to a doctor to treat her hepatitis C. (Tr. 56). The hepatitis C causes sharp pains in her abdomen daily and causes her to be tired. (Tr. 57). She doesn't sleep well because of the pain—maybe 2 hours. (Tr. 57). She takes no naps.

If she walks too much then she can't get out of bed the next day, her hands swell, her back and neck are stiff and can't move. (Tr. 58). She has pain between her shoulder blades all the way up to the base of her skull, in her right hip and ribs and her whole left side from when they took out part of her left lung. (Tr. 58-59). Dr. Killian diagnosed her with arthritis. (Tr. 59). Humid weather causes the swelling in her neck, wrist, elbows, knees, and ankles. (Tr. 59). It hurts in her hip when she bends down. (Tr. 60). She might have a hip and knee replacement in the future, but hasn't yet because she is too young and she would have to get it replaced every ten (10) years. (Tr. 61). She uses the cane to prevent her from falling. (Tr. 61). She falls when she doesn't use her cane. (Tr. 61). Her knee gives out a lot. (Tr. 62). She has some atrophy in her upper thigh and lower calf on her right side. (Tr. 62). She has trouble bathing and getting dressed because of fear of falling and because she cannot bend to put on her pants. (Tr. 62-63). She lies in bed all day three to four days a week. (Tr. 63). She watches TV or reads. (Tr. 63). She has a good day only every one or two months. (Tr. 63). She uses the scooters at the mall

and Walmart. (Tr. 64). She goes to the mall once every three months. (Tr. 64). She tries to cook but she has burns from the grease splattering. (Tr. 64). Dr. Jackman told her it would be hard for her to go back to her previous employment. (Tr. 64). Dr. Golding told her no lifting. (Tr. 64). She has trouble lifting a gallon of milk and walking on uneven surfaces. (Tr. 64-65). She has numbness and tingling at her hands and feet all the time. (Tr. 66). Dr. Golding told her she has neuropathy. (Tr. 66). She has not had any treatment but is having a nerve conduction study in May to figure out what nerves are damaged. (Tr. 66). She drops things because she loses feeling in her hands. (Tr. 66-67). She gets headaches three to four times per week. (Tr. 67). The duration of the headaches depends on if she catches the migraines "in time." (Tr. 67). The headaches turn into migraines once a week and she has to turn off all of the lights and put a cold rag on her head; she takes Excedrin Migraine. (Tr. 67-68).

She cries "a lot." (Tr. 68). She doesn't know what causes her panic attacks. (Tr. 68-69). She feels like she's going to hyperventilate when she's in public. (Tr. 69). She has always had panic attacks but they got worse in 2005. (Tr. 69). Her condition since April 2010 is about the same but worse as to the numbing of her hands and feet and her headaches. (Tr. 69). She lies down, but propped up, on a normal basis. (Tr. 69). She could not work at a job where she could change positions because of the pain and she would need to walk around. (Tr. 70).

### B. Medical Records

Bauman's relevant medical records are summarized as follows:

On October 22, 2009, Bauman was seen by Dr. James Jackman who found that her right knee had a well-healed acetabulum fracture and well-healed patella fracture. (Tr. 293). The x-ray showed some mild arthritic changes in the right hip. (Tr. 293). Bauman's records from St. John's Mercy Medical Center ("Mercy") indicate she was admitted on October 22, 2009. (Tr.

6

297-98, 333-335, 401-18). Her right knee pain was from a motor vehicle collision in October 2008. On November 5, 2008, she went through an open reduction internal fixation (ORIF) of an acetabular fracture. On November 9, 2009, x-rays of her right hip revealed orthopedic fixation of a previous right acetabular fracture. (Tr. 300). X-rays of the sacrum and coccyx revealed prior orthopedic stabilization and no other findings. (Tr. 300). On November 18, 2009, Bauman had hardware from her right knee removed by Dr. Jackman. (Tr. 303-04, 433-80). Her pre- and post-operative diagnoses were symptomatic hardware of the right knee. On November 24-25, 2009, she underwent x-rays of her chest, which revealed a possible 1.2 cm left lower lob nodule warranting short-term imaging follow-up and possible hazy opacity in the superior segment of the lower lobe on the lateral view, which could represent developing pneumonia. An x-ray of the right hand was normal. X-rays of the right knee performed on November 24, 2009, showed evidence within the patella of prior hardware with no evidence of hardware remaining. (Tr. 294, 398).

On March 21, 2010, Bauman was treated for right hand pain, with swelling, after she reported she relapsed and injected herself with cocaine in the right hand and noticed pain around the injection site. (Tr. 315-323). She was diagnosed with right hand/arm pain and swelling related to IV drug use. She reported she had been clean for six months prior to her relapse.

Bauman was admitted to Mercy from October 18-22, 2010 for complaints of lower abdominal wall pain and swelling. (Tr. 556-613). She was diagnosed with abdominal wall abscess with nausea and vomiting and chronic pain disorder. It was noted she had a personal history of MRSA abscess. She was instructed to continue methadone. The abscess was drained at the hospital.

7

On December 10, 2010, Bauman was seen by Dr. Don Richards for a disability determination. (Tr. 341-47). Dr. Richards diagnosed Bauman with other fibromatoses of the muscle, ligament, and fascia; chronic hepatitis without mention of hepatic coma; lumbar sprain and strain; cervicalgia; chronic tension type headache; and combinations of opioid type drug with any other drug dependence. Dr. Richards found that Bauman had muscle tenderness at all 18 points consistent with the trigger points for fibromyalgia. Dr. Richards opined that Bauman's limitations would be walking to 150 feet and she could only lift 15 pounds or less.

On December 13, 2010, Bauman was treated at Mercy after a motor vehicle accident in which she injured her neck. (Tr. 614-27). A cervical spine x-ray showed degenerative changes with solid anterior fusion at C5-C6 and no acute cervical osseous abnormality.

On December 21, 2010, Audra Noel, a single decision maker, performed a physical residual functional capacity assessment of Bauman, which found that Bauman could lift 10 pounds occasionally and frequently less than 10 pounds. She could stand and/or walk at least 2 hours in an 8 hour workday and could sit about 6 hours in an 8 hour workday. Noel stated that climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling by Bauman were limited to occasional and Bauman was never to climb ladders, ropes or scaffolds. (Tr. 99-105).

On June 3, 2011, July 6, 2011, August 2, 2011, Bauman was seen by Dr. Golding and treated for major depressive disorder, insomnia, anxiety, chronic pain, hip pain, osteoarthritis/degenerative joint disease, and back and neck pain. (Tr. 380-85). On October 3, 2011, Bauman was seen by Dr. Golding for medication refills and complaints of low back, right hip, and neck pain. (Tr. 378-79). She was taking Percocet, Xanax, and trazadone. Her chronic problems were listed as chronic pain, insomnia, generalized anxiety disorder, depression, post-traumatic stress disorder, major depressive disorder, and fibromyalgia.

On January 30, 2012, Jennifer Voracheck, Psy.D., gave Bauman a psychological evaluation. (Tr. 361-66). Bauman was diagnosed with major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; and opioid abuse, sustained full remission (15 years' sobriety per claimant report). Her GAF was 52, and no specific limitations were provided.

On January 30, 2012, Dr. Sarwath Bhattacharya gave Bauman a medical examination at the request of the Administration. (Tr. 368-71). It was determined that Bauman's motor vehicle accident in October 2008 left her with multiple injuries; she had surgical repair of the right knee injury and the right acetabulum and she had someone decreased range of movement of these two areas. She also had a left side chest wall injury with broken ribs. Her lungs appeared to have expended "pretty okay". She had a somewhat antalgic gait and she uses a cane which is required for all uneven terrain and outside. She had a history of fibromyalgia, diagnosed two years ago. She had no point tenderness in the back and stated she was "achy all over."

On March 6, 2012, Bauman was seen by Dr. Jackman at St. Louis University. (Tr. 388-89). Bauman had new onset buttock pain with weakness in her hip flexors of unknown chronicity and a normal distal neurovascular exam. Dr. Jackson suggested that Bauman be evaluated by her primary care physician and/or a spinal professional for an evaluation of her low back pain because it was unlikely that that pain was related to her hip pathology. Her right knee status was normal after removal of hardware and x-ray of her pelvis revealed right hip status post acetabulum ORIF. (Tr. 396-97).

On April 4, 2012, Bauman was seen at Hampton Open MRI, which revealed minimal hypertrophic changes of bilateral facets suspected at L4-5, mild circumferential disc bulging and minimal degenerative changes of bilateral facets suspected at L5-S1. The impression was mild desiccation and circumferential bulging of L5-S1 disc without associated neural impingement

9

and minimal hypertropic changes of the bilateral facets at L4-S1. An MRI of the cervical spine revealed a prior fusion or partial ankyloses of C-3 to C-4 vertebral bodies. (Tr. 662-63).

On June 5, 2012, Bauman underwent a psychological evaluation by Thomas J. Spencer, Psy.D. (Tr. 665-68). Bauman reported that she wakes up and has a cup of coffee and a cigarette. She takes her medication and eats cereal. She tries to do the dishes but returns to bed. She typically takes a shower. She talks to her kids and gets on the computer. Her mother does most of the housework. She was diagnosed with major depressive disorder, recurrent, moderate to severe; anxiety disorder NOS; opiate dependence, sustained remission per Bauman; cocaine abuse by history; and a GAF of 45 to 50. Spencer revealed moderate limitations with the ability to make judgments on complex work-related decisions, and to understand, remember and carry out complex instructions. He also found moderate restrictions with her ability to interact appropriately with the public, supervisors and coworkers and her ability to respond appropriately to usual work situations and to changes in a routine work setting due to her major depression and anxiety.

On April 19, 2012, May 3, 2012, May 18, 2012, June 2, 2012, Bauman was seen at the Center for Interventional Pain Management for persistent and increasing low back pain with burning in the affected extremity. (Tr. 673-706). She was typically given a selective nerve root injection bilaterally.

On May 10, 2012, Bauman's liver biopsy at Mercy showed chronic hepatitis, grade 2, stage 2. (Tr. 707-13).

On May 3, 2012 and June 1, 2012, Bauman was seen at Singh Medical Specialists with complaints of anxiety and panic attacks, and feeling overwhelmed with activities of daily living. (Tr. 760-62).

## IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[3] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove

---

[3] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

Bauman claims that the ALJ's RFC determination was not supported by substantial evidence. (ECF No. 17 at 9). Bauman argues that, although ALJ discussed the opinion of Dr. Richards and stated that she gave it "some weight," the ALJ improperly concluded that Bauman could walk more than 150 feet. (ECF No. 17 at 10-11). Bauman complains that the ALJ failed

13

to discuss any other opinion as the basis for Bauman's alleged limitations. (ECF No. 17 at 11). Bauman claims that the ALJ did not take into consideration various medical findings including "decreased range of motion, weakness of hip and grip strength, positive trigger points, antalgic gait, unstable gait, crepitation and positive McMurray sign[.]" (ECF No. 17 at 11 (citing Tr. 297-98, 341-347, 368-75, 388-89, 673-706)). Bauman argues that the ALJ's decision failed to explain how Bauman can perform the postural maneuvers listed in the RFC despite these findings or how the medical evidence supports the RFC reached in this decision. Bauman criticizes the ALJ's decision for mirroring the findings of a single, nonexamining decision maker, Audra Noel, but failing to actually cite to or address this opinion. (ECF No. 17 at 11). Bauman claims that the ALJ did not consider or discuss Dr. Bhattacharya's opinion that Bauman had an antalgic gain, needed a cane for uneven terrain, and had decreased knee flexion. (ECF No. 17 at 11-12 (citing Tr. 368-375)).

As to her mental impairments, Bauman states that the ALJ's decision improperly relied only on the report from Dr. Voracheck, which was a one-time evaluation. (ECF No. 17 at 13). Bauman claims that the ALJ's decision was inconsistent because it stated that there was no evidence of the limitations that Dr. Spencer gave, but then conceded that Bauman would have some limitations in her concentration. (ECF No. 17 at 12-13). Bauman states that Dr. Spencer provided the only opinion regarding her difficulties in interacting with the public, co-workers and supervisors (Dr. Voracheck did not opine regarding these areas) but the ALJ found no evidence of these limitations; Bauman claims that this opinion was not based upon substantial evidence. Bauman also states that the ALJ failed to explain how Bauman's severe impairments of anxiety and depression affect her ability to perform work-related activities but it is not clear from the opinion what limitations are caused by these impairments. (ECF No. 17 at 13).

14

In response, the Administration claims that the ALJ properly evaluated the entire record and that the ALJ's RFC determination was supported by substantial evidence, including medical opinion evidence, Bauman's activities of daily living, and objective medical evidence. (ECF No. 23 at 5 (citing Tr. 20-26)). That Administration claims that the ALJ properly wove her credibility analysis into her evaluation of the medical evidence and her RFC determination. (ECF No. 23 at 5). The ALJ concluded that Bauman had some significant sedentary-level restrictions due to her impairments, but her allegations of disabling restrictions were less than fully credible. (ECF No. 23 at 5 (citing Tr. 21-25)). First, the ALJ found that Bauman's daily activities did not reflect the level of disability that she was claiming. (Tr. 25). The ALJ noted that Bauman cooked, took care of her dog, occasionally drove, shopped for groceries, and performed various household chores. (ECF No 23 at 6 (citing Tr. 20, 40, 49-50, 63-64, 364, 666)). Second, the ALJ considered Bauman's "relatively infrequent trips to the doctor" for her allegedly disabling symptoms and the "essentially routine and conservative" treatment she received. (ECF No. 23 at 6 (citing Tr. 25, 376-663, 673-762)). The ALJ pointed out that Bauman was not treated by a specialist for fibromyalgia and surgery was not recommended. (ECF No. 23 at 6 (citing Tr. 25, 378-85, 528-632, 673-706)). The ALJ noted that Bauman received minimal treatment for depression and anxiety, received no inpatient treatment, and her psychiatric care was generally managed by her primary care physicians. (ECF No. 23 at 6 (citing Tr. 25-26, 51, 361-62, 522, 530, 532, 593-94, 665-66)). The ALJ also noted the objective medical evidence, including the MRIs and x-ray scans, showed only minimal degenerative disc disease with no cord impingement. (ECF No. 23 at 7 (citing Tr. 25, 614-19, 621-22, 627, 663, 685-86)). Bauman's treating and examining physicians did not indicate she was disabled or indicate any disabling limitations. (ECF No. 23 at 7 (citing Tr. 25, 378-85, 528-632, 673-706)). Bauman's primary

care physicians noted few, if any, psychiatric symptoms. (ECF No. 23 at 7 (citing Tr. 25, 317, 381, 383, 385, 522, 530, 532, 591, 593-94, 619, 701, 703, 705)). The Commissioner emphasizes that no physician that examined Bauman submitted a medical conclusion that she was disabled and unable to perform any type of work. The Commissioner admitted that the ALJ considered and gave only some weight to Dr. Richards' opinion considering Bauman's functional abilities but found that Bauman's leg injuries were accommodated by the limitation to sedentary work with additional climbing and postural limitations. (ECF No. 23 at 7 (citing Tr. 21)). The ALJ did not include Dr. Richards' opinion that Bauman was restricted from walking no more than 150 feet because Bauman's orthopedist imposed no such limitation and she was never prescribed a can for ambulation. (ECF No. 23 at 8 (citing Tr. 25)). The ALJ also noted inconsistencies in Dr. Richards' findings such as (1) Bauman had a distinctly weaker grip in right hand during testing but grip was firm and aggressive when shaking hands at the end of the meeting (Tr. 23, 345-46), (2) Bauman denied numbness, loss of power, or swelling in any extremity except for her hand when she was admitted for a hand infection in March 2010 (Tr. 23, 315-24), (3) Bauman had an antalgic gait during an examination with her primary care physician in October 2010, but did not use a cane (Tr. 23, 297, 346), and (4) there was no change in Bauman's condition that would necessitate a case to walk more than 10 feet by December 2010 (Tr. 23, 346). (ECF No. 23 at 8). The ALJ also gave "some" weight to the opinion of psychiatric consultative examining physician Jennifer Voracheck, Psy.D., when the ALJ found that a moderate degree of limitation due to Bauman's mental impairments was generally consistent with the record. (ECF No. 23 at 8-9 (citing Tr. 25)). The ALJ further considered the findings of Thomas Spencer, Psy.D., who did not find any marked limitation during his examination of Bauman. (ECF No. 23 at 9). Spencer determined that Bauman was able to concentrate

16

adequately and had no difficulty interacting at both consultative psychiatric examinations and that Bauman's treating physicians noted no such limitations. (ECF No. 23 at 9 (citing Tr. 25-26, 317, 365-66, 379, 381-85, 522, 532, 593-94, 619, 667-71, 701-05)). The Commissioner maintains that the ALJ gave Bauman the benefit of the doubt by limiting Bauman to semi-skilled work. (ECF No. 23 at 9 (citing Tr. 21, 26)). The Commissioner contends that the ALJ resolved the conflicts among the various treating and examining physicians and did not have to rely entirely on one doctor's opinion, nor is the ALJ limited to a simple choice of medical opinions of record when formulating the RFC. (ECF No. 23 at 9). The Commissioner contends that the ALJ properly considered the entire record, including the findings and opinions of examining and treating physicians. (EF No. 23 at 10). The Commissioner contends that the ALJ adequately accounted for Bauman's credible degree of limitation due to her physical and mental medical impairments by limiting Bauman to a sedentary range of semi-skilled work with additional limitations on climbing, balancing, kneeling, stooping, crouching, and crawling. (ECF No. 23 at 10).

The Court finds that the ALJ's opinion was supported by substantial evidence. The Court holds that the ALJ appropriately evaluated Bauman's credibility as part of determining the RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). The ALJ evaluated the medical evidence, Bauman's activities of daily living and the supporting medical evaluations to evaluate Bauman's credibility and determine her RFC. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)(citing *Reynolds v. Chater*, 82 F.3d 254, 258 (8th Cir. 1996)("Although specific articulation of credibility findings is preferable, [the Court] consider[s] the lack thereof to

constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record.").

As noted by the ALJ, Bauman's treatment pattern was intermittent and conservative. Bauman never experienced the sustained and intensive treatment that one would expect of someone with a disabling mental or physician impairment. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)(A pattern of conservative medical treatment is a proper factor for an ALJ to consider in evaluating a claimant's credibility.). Likewise, Bauman's activities of daily living, including shopping, occasional driving, caretaking, do not reflect a disabling impairment. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)(fact that claimant "continues to engage in many normal daily living activities including driving, shopping, visiting with friends and relatives, and picking up her grandchild" supports finding of ability to work); *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (grocery shopping, driving, and daily child care inconsistent with claims of disabling pain); *Walker v. Shalala,* 993 F.2d 630, 631–32 (8th Cir.1993) (daily activities of driving, cooking and washing dishes inconsistent with claims of disabling pain). Further, Bauman cannot point to any physician who ordered her or otherwise advised that she was unable to maintain any substantial gainful activity. *See Young*, 221 F.3d at 1069 (The Court finds it "significant that no physician who examined [Bauman] submitted a medical conclusion that she is disabled and unable to perform any type of work."). Finally, the Court finds that the ALJ properly evaluated the medical evidence, including the opinions of Dr. Richards, Dr. Spencer, and Dr. Voracheck. The ALJ noted the inconsistencies within Dr. Richards' opinion and also with the rest of the record and afforded it some weight. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)("the ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a

whole")(internal quotations omitted). Likewise, the ALJ appropriately evaluated the opinion of nonexamining physician Dr. Voracheck and found that her opinion was compatible with other evidence in the record and afforded it greater weight. *See Shimkus v. Apfel*, 72 F. Supp. 2d 1056, 1059 (S.D. Iowa 1999)("the fact the ALJ may have given greater weight to the opinions of nonexamining consultants than to [the treating physician] is not reversible error provided the ALJ explained his reasons for doing so"); *Davis v. Schweiker*, 671 F.2d 1187, 1189 (8th Cir.1982). The ALJ also incorporated the credible limitations noted by Dr. Spencer by including a semi-skilled work limitation in the RFC. Moreover, with respect to the opinion of Dr. Bhattacharya, the ALJ is not required to discuss every opinion or piece of evidence, as long as the opinion is supported by substantial evidence, which the Court holds that it is. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered...."). In sum, the Court finds that the ALJ properly evaluated and considered the evidence in determining Bauman's credibility and RFC and that the ALJ's decision is supported by the evidence.[4]

## VI. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

---

[4] The Commissioner also sets forth the argument that the ALJ properly determined Bauman could perform past, relevant work and, alternatively, other work. (ECF No. 23 at 10-12). This argument was not presented by Plaintiff in her brief. (ECF No 17 (arguing only that the RFC was not supported by substantial evidence)). To the extent that this argument is before the Court, it agrees with the Administration's position, particularly the finding that the ALJ made an appropriate alternative finding at step five to show that Bauman could perform other work. (ECF No. 23 at 11); *see also Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994)("We thus not only specifically reject plaintiff's objection to the ALJ's alternative disposition here, but expressly reaffirm our favorable view of such dispositions generally.").

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 25th day of March, 2015.

*Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE